**BORG–WARNER PROTECTIVE SERVICES CORP.**

v.

**GUARDSMARK, INC.**

**Harold I. LLOYD, et al.**

v.

**GUARDSMARK, INC.**

**Civil Action Nos. 94–169, 95–124.**

United States District Court,
E.D. Kentucky,
Covington Division.

Nov. 27, 1996.

Thomas R. Nienaber, Busald Funk Zevely, P.S.C., Florence, KY, Thomas L. Henderson, McKnight, Hudson, Lewis & Henderson, Memphis, TN, for Plaintiffs.

Harry D. Rankin, Greenebaum Doll & McDonald, Covington, KY, David Wade, Martin, Tate, Morrow & Martson, P.C., Memphis, TN, for Defendant.

### *OPINION AND ORDER*

BERTELSMAN, Chief Judge.

This matter is before the court on cross-motions for summary judgment (docs. #161 and #193 in 94–169 and docs. #57 and #83 in 95–124). After conducting oral arguments and reviewing supplemental briefs, it is determined that summary judgment should be entered in favor of the defendant on all claims.

### BACKGROUND

Guardsmark and Borg–Warner are competitors in the private security guard industry. The parties agree that there are over 13,000 private security guard firms in this country. Guardsmark is the fifth largest of these, and Borg–Warner is even larger than Guardsmark.

Initially, Guardsmark contracted with the Gap to provide security officers for the Erlanger, Kentucky Gap facility. Guardsmark advertised for and recruited security guard applicants to work at the Gap facility. It required the applicants to complete a 28–page application form, undergo either the MMPI or MMPI–2 psychological test, submit to a drug test, undergo a police background check, submit notarized statements regarding periods of unemployment, and provide character references and fingerprints. In addition, Guardsmark personnel checked neighborhood references, personal references and offered polygraph examinations. Clark depo. at 22–24; *see also* Bisch depo. at 88–91 and 117–118. Each individual plaintiff admits that he underwent these screening procedures. Fillenwarth depo. at 11, 13–16 [1]; Fitch depo. at 14, 16, 18–19, 27–28; Lloyd depo. at 18, 23, 25–26.[2] The plaintiffs vaguely contend that these procedures were not followed 100% of the time, but John Clark, of Guardsmark, testified that these procedures were followed as to each of the security guards placed at the Gap. Clark depo. at 22–23. The testimony of the Gap security supervisor, Richard Bisch, supports Clark's statements. Bisch depo. at 89, 94, 116–118.

In addition to recruiting and placing the security guards at the Gap facility, Guardsmark assisted in training each security guard recruit. Guardsmark required each security guard to view videotapes concerning fire safety and other security issues and to take tests regarding the topics covered in the videotapes. Sisson aff. at 3; Clark depo. at 22. Each plaintiff admits that he received this generalized training. Fillenwarth depo. at 18; Fitch depo. at 18–19; Lloyd depo. at 27.

Also, each security guard placed at the Gap underwent an 80–hour on-the-job training program. Bisch depo. at 104–113. This 80–hour specialized training program consist-

---

**1.** Fillenwarth denies that he submitted to a drug screen. Fillenwarth depo. at 16.

**2.** Lloyd did not recall whether he took a drug test. Lloyd depo. at 27.

ed of receiving training on each post at the Gap facility with either a Gap security supervisor or Guardsmark's on-site training officer, Nick Bosse. Sisson aff. at 3; Sheppard depo. at 83–84. It is undisputed that Guardsmark did not charge the Gap for the first two weeks that a new security guard was placed at the Gap so that the new guard could receive this on-site training.

Guardsmark requires each of its employees to enter into a covenant not to compete that states:

> Employee hereby agrees that following his (her) termination of employment with GUARDSMARK, whether voluntary or involuntary, for a period of one year thereafter he (she) will not perform or hire others to perform any security services at the site, place or location where he (she) performed security services within the immediate preceding twelve (12) months of his (her) employment with GUARDSMARK.

The contract also provides that Tennessee law governs the interpretation of the contract. Guardsmark uses these form contracts with all of its security guards nationwide.

Ultimately, Borg–Warner obtained the Gap contract from Guardsmark. Consistent with its practice, Borg–Warner sought to hire the Guardsmark security guards already working at the Gap and promised the guards that it would represent them in the event that Guardsmark attempted to enforce its non-compete clauses. This is a relatively common practice in the security guard industry.

As is its practice, Guardsmark enforced its covenants not to compete. However, Guardsmark also offered each of its Gap security guards employment at another facility.

On May 5, 1994, Guardsmark filed a tort claim against Borg–Warner in the Chancery Court of Shelby County, Tennessee for intentional interference with contractual relations. Guardsmark claimed that Borg–Warner intended to cause Guardsmark employees to breach their contracts with security guards in Seattle, Washington and Birmingham, Alabama.

Shortly thereafter, Borg–Warner filed an action in an Alabama state court seeking to resolve the issues at stake in the Tennessee chancery court. On August 29, 1994, Tennessee Chancellor Neal Small issued a restraining order enjoining Borg–Warner from "taking any action to interfere with Guardsmark's restrictive covenants with its past, present or future employees and from making misrepresentations regarding Guardsmark and its restrictive covenants." The order also enjoined Borg–Warner from initiating, encouraging or assisting in litigation to challenge Guardsmark's restrictive covenants with its employees.

On September 21, 1994, Guardsmark filed a verified petition to hold Borg–Warner in contempt in Shelby County, Tennessee. Guardsmark based its contempt motion on statements allegedly made to a Guardsmark security guard formerly assigned to the Gap facility in Erlanger, Kentucky. While the contempt motion was pending, Borg–Warner filed this case.

Borg–Warner's initial complaint listed Borg–Warner as the sole plaintiff and included Chancellor Small and the Shelby County Chancery Court as defendants. The complaint alleged claims under the First Amendment, the Supremacy Clause, the Full Faith and Credit Clause, and the Anti–Injunction Act (28 U.S.C. § 1738), and sought only injunctive relief. *See* doc. 1. In addition to the complaint, Borg–Warner sought a preliminary injunction enjoining Chancellor Small and Guardsmark from enforcing Chancellor Small's injunctions and restraining orders. Doc. #2 at 1.

Concluding that this court lacks personal jurisdiction over Chancellor Small, the court denied Borg–Warner's motion for a preliminary injunction. Since that time, Borg–Warner has voluntarily dismissed its claims against Chancellor Small for lack of personal jurisdiction.

Borg–Warner later filed a second amended complaint, adding a claim under 42 U.S.C. § 1983, antitrust claims and supplemental state law claims against Guardsmark. In addition, the second amended complaint add-

ed 100 unnamed plaintiffs that formerly worked for Guardsmark at the Gap.

Ultimately, the court resolved all of Borg–Warner's claims against Guardsmark except its federal and state antitrust claims and its claims under Kentucky common law. In addition, the court dismissed the claims alleged by the 100 "John Doe" plaintiffs. Approximately eleven months after Borg–Warner filed its initial complaint, three former Guardsmark security guards filed a similar action, alleging claims under the Sherman Antitrust Act, the analogous Kentucky Consumer Protection Act, and Kentucky common law.

All plaintiffs have voluntarily dismissed their claims under § 2 of the Sherman Antitrust Act and the analogous section of the Kentucky Consumer Protection Act. This matter is now before the court on cross-motions for summary judgment on the remaining claims.

## PLAINTIFFS' CLAIMS ARE NOT BARRED BY RES JUDICATA

■ Guardsmark first contends that plaintiffs' claims are barred by res judicata. The Shelby County, Tennessee Chancery Court previously concluded that Guardsmark's covenants not to compete are valid under both Tennessee and Kentucky law. According to Guardsmark, Chancellor Small's decision precludes the plaintiffs from again challenging the validity of those covenants under Kentucky law and § 1 of the Sherman Antitrust Act.

"A final, valid determination on the merits is conclusive on the parties and those in privity with them, as to matters that were litigated or should have been litigated, in another action or proceeding involving the same cause of action." 1B Moore's *Federal Practice* § 0.405[3], at III–15 (2nd ed.1995). Furthermore, "a final valid judgment, even if erroneous on either the facts or the law, must be given a binding effect as res judicata or collateral estoppel, in either a federal or

state tribunal." *Id.* at § 0.405[4.–1], p. III–23.

Twenty-eight U.S.C. § 1738 requires that a federal court give the same preclusive effect to the judgment of a state court that would be given in the state in which the judgment was rendered. *Whitfield v. City of Knoxville,* 756 F.2d 455 (6th Cir.1985). Therefore, this court must look to Tennessee law to determine whether Chancellor Small's judgment should be given preclusive effect.

■ "[O]nly a final judgment is res judicata." 1B Moore's *Federal Practice* § 0.409[1.–1], at III–123. Under Tennessee law, "a judgment is not final and res judicata where an appeal is pending." *McBurney v. Aldrich,* 816 S.W.2d 30, 34 (Tenn.Ct.App. 1991).[3] This is true unless the appeal has been abandoned and is, therefore, considered adjudged. *Smith v. Metropolitan Development Housing Agency,* 857 F.Supp. 597 (M.D.Tenn.1994).

In this case, Borg–Warner appealed the Tennessee Chancellor's decision on February 16, 1996. There is no evidence that this appeal has been abandoned. Therefore, Chancellor Small's decision that Guardsmark's covenant not to compete is valid under Kentucky law is not a final judgment. Accordingly, res judicata principles do not apply to that judgment, and this court should independently evaluate all of plaintiffs' claims.

## PLAINTIFFS HAVE FAILED TO ESTABLISH THE CONSPIRACY NECESSARY TO SUPPORT A § 1 CLAIM

■ Section 1 of the Sherman Antitrust Act provides:

Every contract, combination ... or conspiracy, in restraint of trade or commerce among the several States ... is declared to be illegal.

15 U.S.C.A. § 1 (Supp.1995). To state a valid claim for violation of § 1 of the Sherman Antitrust Act, a plaintiff must allege

---

**3.** The rule in Tennessee is the minority rule. Under the federal rule and the rule of the majority of states, "the pendency of an appeal does not suspend the operation of an otherwise final judg-

ment as res judicata or collateral estoppel...." 1B Moore's *Federal Practice* 40.416[3–2], at III–322, III–323 and fn. 1 (2nd ed.1995).

facts sufficient to establish the following elements:

(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury.

*Denny's Marina, Inc. v. Renfro Prod., Inc.,* 8 F.3d 1217, 1220 (7th Cir.1993); *see also Postal Instant Press v. Jackson,* 658 F.Supp. 739 (D.Colo.1987); *Middlebrooks v. Eustis,* 563 F.Supp. 1060 (M.D.Fla.1983).

■ The conspiracy required to state a claim under § 1 of the Sherman Antitrust Act "is not possible as a matter of law between a corporation and its employees unless those employees have an independent personal stake and stand to benefit from conspiring to restrain trade."[4] *Caremark Homecare v. New England Critical Care,* 700 F.Supp. 1033, 1035 (D.Minn.1988); *see also Motive Parts Warehouse v. Facet Enterprises,* 774 F.2d 380 (10th Cir.1985); *Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc.,* 531 F.2d 910 (8th Cir.1976); *Bellamy v. Mason's Stores, Inc.,* 508 F.2d 504 (4th Cir.1974); *Irving Scher, Antitrust Adviser* § 1.06 (4th ed.1995); Phillip Areeda, 7 Antitrust Law ¶ 1470, p. 282–284 (1986). Indeed, the Supreme Court, in discussing a related issue, concluded:

[I]t is perfectly plain that an internal "agreement" to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 [of the Sherman Antitrust Act] was designed to police. The officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals.... For these reasons, officers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy.

*Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 769, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984); *see also Guzowski v.*

*Hartman,* 969 F.2d 211 (6th Cir.1991), *cert. denied,* 506 U.S. 1053, 113 S.Ct. 978, 122 L.Ed.2d 132 (1993); *Potters Medical Center v. City Hospital Ass'n.,* 800 F.2d 568, 573 (6th Cir.1986).

One case applying these principles is nearly identical to the case at bar. In *Caremark Homecare, Inc. v. New England Critical Care, Inc.,* 700 F.Supp. 1033 (D.Minn.1988), a health care service provider filed suit against certain former employees to enforce a covenant not to compete. The employees counterclaimed that the employer violated §§ 1 and 2 of the Sherman Antitrust Act by "forcing" them to sign covenants not to compete. In dismissing the § 1 claim, the court concluded that the necessary conspiracy was not possible as a matter of law between the corporation and its employees because those employees did not have an independent personal stake in the matter and did not stand to benefit from conspiring to restrain trade. *Id.* at 1035; *see also Marshall v. Miles Laboratories, Inc.,* 647 F.Supp. 1326 (N.D.Ind. 1986).

In this case, plaintiffs contend that Guardsmark conspired with its own security guard employees to restrain trade in violation of § 1 of the Sherman Act. Guardsmark admittedly required its employees to sign covenants not to compete. The employees signed the agreements because they were required to do so in order to maintain their employment with Guardsmark. The employees did not have any independent personal stake and did not stand to benefit from conspiring to restrain trade. Therefore, it is impossible, as a matter of law, for the employees to provide the plurality of actors imperative for a § 1 conspiracy.

Plaintiffs claim, without citation to authority, that the above concepts do not apply in this case because Guardsmark requires its employees to sign the covenants not to compete as a condition precedent to their employment. Therefore, plaintiffs contend, the

---

**4.** It is unclear whether the Sixth Circuit would even recognize this independent personal stake exception. In *Potters Medical Center v. City Hospital Ass'n.,* 800 F.2d 568, 573 (6th Cir.1986), the court stated, "Although several courts have recognized the 'independent personal stake' exception to the rule that officers and agents lack capacity to conspire with their corporation, ... this circuit has never endorsed the exception. In fact, this court has noted the 'rather substantial policy reasons for not adopting such an exception.'" *Id.* (citations omitted).

signers of the covenants are not technically employees of Guardsmark at the time they sign the agreements. Plaintiffs' contention is without merit.

The covenant specifically refers to the signers as "employee" and becomes applicable only upon termination from employment with Guardsmark. Although the individuals may technically be applicants rather than employees at the time they sign the covenants, they are not acting as independent economic forces with any reason to restrain trade. Therefore, defendant is entitled to summary judgment on plaintiffs' claim under § 1 of the Sherman Antitrust Act.[5]

## THE COVENANTS ARE VALID UNDER KENTUCKY AND TENNESSEE LAW

■ Plaintiffs contend that the covenants must be evaluated under Kentucky law, but the defendant claims that Tennessee law is applicable. However, the court need not make this determination because—after careful consideration and research—the court concludes that the covenant at issue is valid regardless of which state's law is applied.

Where, as here, the covenants not to compete are signed by employees who lack a great deal of bargaining power, the enforcement of those covenants presents a conflict between fundamental legal policies. As noted in one recent article:

Every time a noncompetition clause is litigated, the court is forced to grapple with two conflicting policies. The first policy is the freedom to contract, which has been protected by American courts since the early nineteenth century. This doctrine has existed to "encourage individual entrepreneurial activity" and has "been extolled as one of the great boons of modern democratic civilization, as one of the principal causes of prosperity and comfort." In the noncompetition clause setting, strict adherence to this doctrine would result in complete enforcement of all noncompetition clauses. The second doctrine, "[o]ne of the

oldest and best established ... [contract] policies developed by courts," is the doctrine against contractual restraints of trade. This doctrine holds that parties may not make contracts which overly restrict the fundamental right to practice a trade. Noncompetition clauses clearly are restraints on trade. Strict adherence to this doctrine, then, would result in judicial rejection of all noncompetition clauses. Obviously, these two fundamental principles of contract law are in direct conflict. The courts might have resolved this conflict by consistently striking a balance between the two principles.

Peter J. Whitmore, *A Statistical Analysis of Noncompetition Clauses in Employment Contracts*, 15 J. Corp. L. 483 (Spring, 1990) (footnotes omitted).

Until the last several decades, courts exhibited great reluctance to enforce such covenants against employees whose services were not unique in some way. This was true unless the employee had access to trade secrets or customer lists or could appropriate customer good will upon leaving his or her employment.

Thus, Walsh observed:

The negative promise not to engage in like service for another will not be enforced unless the services to be rendered by the defendant are unique in the sense that the services of another person equally qualified cannot be readily secured. Therefore such a contract made by a salesman or by an actor without outstanding merit and reputation, will not be enforced in equity. For this reason a contract by an employe [sic] of the usual type not to engage in a similar line of employment with a competitor for a stated time after his employment is ended will not be specifically enforced, as the remedy at law is adequate, though if it appear that he has been entrusted with secrets of the employer's business he may be enjoined from using such secrets in competition with his former employer, ei-

---

**5.** The parties agree that the Kentucky Consumer Protection Act is virtually identical to the Sherman Antitrust Act and has been interpreted as such. Therefore, if the defendant is entitled to summary judgment on the Sherman Antitrust Act claim, it is also entitled to summary judgment on the Kentucky Consumer Protection Act claim.

ther in a business of his own or in the employ of any other person.

Walsh, *A Treatise on Equity*, 338 (1930) (footnotes omitted).

Furthermore, it is stated in 42 Am.Jur.2d, Injunctions § 109, at 110:

**Character of services to be performed.**

An adult who has bound himself by contract to render special, unique, or extraordinary personal services or acts, or to render services which are intellectual, or peculiar and individual in their character, or who has special, unique, or extraordinary qualifications, may be restrained from breaching the negative covenant in his contract of employment not to render services to another. On the other hand, such relief will be denied if the services are ordinary, mechanical, without special merit, and can be readily supplied or obtained from others without much difficulty or expense. The result is that in the case of contracts to render services which require no special skill or qualifications, a breach by an employee will not be enjoined even though the employee has expressly agreed to work for no one else, or to devote all his time to the service of the complainant.

**Particular employments.**

The equity courts, in recognition and application of the rules underlying the assertion of their injunctive powers to prevent breaches of restrictive covenants in contracts for services or acts by those possessing special, unique, or extraordinary qualifications, have intervened by injunction to prevent breaches of employment contracts by newspaper writers and reporters; actors and actresses; singers; music teachers; professional athletes, including baseball, football, and basketball players, and boxers; acrobats; and various others. But even in the case of singers, actors, or performers, injunction will not issue if the employee is not of such ability

and reputation that his place cannot be readily filled.

*Id.* (citations omitted).

Plaintiffs here rely heavily on this line of authority. *Cf. Calhoun v. Everman*, 242 S.W.2d 100 (Ky.1951) (lack of mutuality stressed). However, the more modern cases, including those in Kentucky, place more emphasis on the employer's investment in the employee and have evolved an approach balancing the importance of that factor against the hardship to the employee and the public interest.[6]

Thus, in *Central Adjustment Bureau v. Ingram Assoc. Inc.*, 622 S.W.2d 681 (Ky.Ct. App.1981), the most recent Kentucky case on this subject, a two-year covenant was enforced against the former employee of a collection agency, whose services were in no way unique. Quoting from *Hammons v. Big Sandy Claims Service, Inc.*, 567 S.W.2d 313 (Ky.Ct.App.1978), in which a covenant not to compete was enforced against a claims adjuster, the *Central Adjustment* court said:

"[I]t has been held in Kentucky *that an agreement in restraint of trade is reasonable if, on consideration and circumstances of the particular case, the restriction is such only as to afford fair protection to the interests of the covenantee and is not so large as to interfere with the public interests or impose undue hardship on the party restricted.*" *Ceresia v. Mitchell, Ky.,* 242 S.W.2d 359 (1951).

Contrary to appellees' argument, we believe the proposition enunciated in the *Hammons* case supports our decision. CAB's business is highly specialized and competitive, and since clients sign no written contract they are free to change collectors almost overnight. *Thus, covenants not to compete are about the only protection available to CAB to prevent employees from resigning and attempting to pirate away their clients after CAB has expended considerable time, effort,*

---

**6.** The Tennessee Supreme Court has adopted a "rule of reasonableness." Under that rule, Tennessee courts—absent bad faith by the employer—will enforce covenants not to compete to the extent necessary to protect the employer's interests without imposing undue hardship on the employee as long as the public interest is not adversely affected. *Central Adjustment Bureau, Inc. v. Ingram,* 678 S.W.2d 28 (Tenn.1984).

*and money in training those employees* in the collection business. Absent the training afforded by CAB, its employees would hardly be in a position to compete. Therefore, we are satisfied that CAB's covenants not to compete are a reasonable restriction affording CAB fair protection for its legitimate business interests. *Central Adjustment Bureau v. Ingram Assoc. Inc.,* 622 S.W.2d at 685–86 (emphasis added). Indeed, the *Hammons* court stated as a general proposition that, if such covenants are "confined to a reasonable territory," they are enforceable, even if unlimited as to time.

Although the Kentucky Court of Appeals did not use the term in either of the above cases, it put heavy reliance on an employer's right to protect itself from "disintermediation." This is a twenty-dollar word meaning to cut out the middleman.

It is to be noted that the courts place no weight on any unique quality of the employees in these cases. Indeed, they were ordinary debt collectors or claims adjusters, probably possessing similar educational qualifications as the security guards in the case at bar.

Although considerable advocacy was utilized in the effort, plaintiffs here have not rebutted defendant's claim that Guardsmark, as the plaintiff in *Central Adjustment,* spent "considerable, time, effort and money in training" its employees. As set forth above, the guards spent two weeks in on-the-job training becoming familiar with the particularized security requirements of the client's site. It is not disputed that this was at Guardsmark's expense. Also, the guards became familiar with the culture of the client's firm and the client's own security personnel.

All of this made Guardsmark—like the collection agency and claims adjustment companies in the above cases—vulnerable to disintermediation. In *Consultants and Designers v. Butler Service Group,* 720 F.2d 1553, 1558–59 (11th Cir.1983), the court emphasized that the interest of "the much maligned but time-honored middleman" is a legitimate one that deserves protection against disintermediation. In that opinion, the court observes that the middleman must find a

contractual means to protect itself or the employees, clients or competitors will "opportunistically appropriate" its work product "without paying it the full value of its services." *Id.* at 1559. The discussion of the court is highly persuasive to this court but too lengthy to quote in full. *See also Janice Doty Unlimited, Inc. v. Stoecker,* 684 F.Supp. 973 (N.D.Ill.1988).

The legitimate interest of the employer must be balanced against hardship to the employee and the public. *Vencor, Inc. v. Webb,* 33 F.3d 840 (7th Cir.1994). The covenant here has been carefully drawn to minimize such hardship, since it is applicable only to the specific client site where the employee worked and for which plaintiff trained him or her. The uncontradicted evidence demonstrated that the security guard positions are low level and the employees can easily find comparable employment elsewhere. Indeed, all the plaintiffs promptly found other employment. Thus, the employees' and public's interests are protected to the extent possible.

Therefore, the court being advised,

**IT IS ORDERED** as follows:

1. Guardsmark's motions for summary judgment (doc. # 193 in 94–169 and doc. # 83 in 95–124) are **granted** on plaintiffs' claims under § 1 of the Sherman Antitrust Act, the analogous section of the Kentucky Consumer Protection Act, and Kentucky common law;

2. Borg–Warner's motion for summary judgment (doc. # 161 in 94–169) is **denied;**

3. The individual plaintiffs' motion for summary judgment (doc. # 57 in 95–124) is **denied;** and

4. A separate Judgment shall enter concurrently herewith.