IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 18, 2008 Session

## COLUMBUS MEDICAL SERVICES, LLC
v.
## DAVID THOMAS AND LIBERTY HEALTHCARE CORPORATION

## COLUMBUS MEDICAL SERVICES, LLC
v.
## M. B. "JUN" PACRIS, JR., LYNNA JARDELEZA DAWN LOCKE, MARIA MADARANG, STEPHEN MONISIT, LIZA PABALATE, CANDI McMORRAN, MONICA ROBERTS, AND KIMBERLY CRAWFORD

**A Consolidated Appeal from the Circuit Court for Shelby County**
**No. CT-002181-04/CT-006965-03     James F. Russell, Judge**

**No. W2008-00345-COA-R3-CV - Filed August 13, 2009**

This appeal involves a claim of tortious inducement to breach a non-compete covenant in an employment agreement. The plaintiff staffing agency employed the defendant therapists at a State residential care facility for severely disabled persons. The plaintiff agency staffed the facility under an exclusive contract which was set to expire by its own terms in June 2003. The therapists had executed restrictive covenants in their employment agreements with the plaintiff staffing agency under which they were prohibited from working at the State facility for one year after the termination of their employment with the plaintiff. The State requested bids to staff the facility under a new contract. Through the bidding process, the defendant staffing agency was awarded the contract. The defendant agency then met with the defendant therapists (who were incumbent employees), staffed through the plaintiff agency, and offered to hire them to continue working at the facility. The defendant staffing agency was aware of the non-compete covenants and agreed to indemnify the defendant therapists if the plaintiff staffing agency tried to enforce the covenants. The defendant therapists accepted positions with the defendant agency and continued working at the facility. The plaintiff agency filed this lawsuit against the individual defendant therapists and the defendant agency. After a bench trial, the trial court concluded that the non-compete covenants were enforceable, that the defendant therapists had breached their covenants, and that the defendant staffing agency had tortiously induced the individual defendant therapists to breach their employment contracts. The defendants now appeal. We reverse, concluding that, while the plaintiff agency had a legitimate protectable business interest, the non-compete covenants are not enforceable in light of the hardship to the defendant therapists and the adverse impact on the public interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Reversed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Paul G. Summers, Michael K. Stagg, and Thomas H. Lee, Nashville, Tennessee; and Robert L. J. Spence, Jr., Memphis, Tennessee, for the appellants, M.B. "Jun" Pacris, Jr., Lynna Jardeleza, Dawn Locke, Maria Madarang, Stephen Monisit, Liza Pabalate, Candi McMorran, Monica Roberts, Kimberly Crawford, and Liberty Healthcare Corporation.

Clarence A. Wilbon and William G. Whitman, Memphis, Tennessee, and Sean P. McDevitt, Berwyn, Pennsylvania, for the appellee, Columbus Medical Services, LLC.

**OPINION**

**BACKGROUND**

The Arlington Developmental Center ("Arlington") is a residential facility in Arlington, Tennessee, serving persons with disabilities, both physical and mental, ranging from speech impairments to physical incapacity and varying degrees of mental retardation. There are over 200 residents living at the Arlington facility. The 24-hour support provided to the residents includes therapeutic services from occupational therapists, speech therapists, and physical therapists. The therapists implement daily activity programs, therapies, and supports, many using repetition and routine to enable the residents to make progress over a long period of time.

The therapists utilized by Arlington are highly educated and specialized, all with college degrees and some with master's degrees, and staffing a particular therapist position can entail a wide-ranging search. To do so, Arlington engaged the services of Plaintiff/Appellee Columbus Medical Services, LLC ("Columbus"), a staffing agency that provides services to state-run mental health care and mental retardation facilities throughout the United States. Columbus seeks out candidates to fill positions, prescreens the candidates, checks their references, background and credentialing, and brings the candidates to the location to meet with the facility's management. Beginning in 1994, pursuant to a series of exclusive contracts with the State of Tennessee ("State"), Columbus provided Arlington with a staff of physical, occupational, and speech language therapists.[1]

In the following years, Arlington became the subject of a federal lawsuit arising out of the care furnished to its residents. At the conclusion of the federal court action in 2001, Arlington became subject to an order requiring strict oversight by the federal district court. To fulfill the mandates of the federal order, the State hired consultants to come to Arlington to give the staff intensive, specific training on the best practices for treating the type of patient population at Arlington, with developmental disabilities and mental retardation.[2] Some of the Arlington staff who received the State-provided training were therapists who were employed at Arlington through

---

[1] Columbus also provided staff to the State's affiliated Western Tennessee Regional Office ("WTRO").

[2] The federal court order regarding the Arlington Center is not included in the appellate record.

-2-

Columbus. The training was provided to them during working hours that were paid through Columbus.

At the time that Arlington became subject to the federal consent order, it needed to hire someone to take over its management. David Thomas ("Thomas") was then vice president and chief operating officer of Columbus. Thomas contacted Jerry Johnson ("Johnson"), whom Thomas had known for years through professional associations, and suggested that Johnson apply for the management position at Arlington. Johnson was hired, and he served as the Superintendent at Arlington from 2001 through 2004.

Sometime in 2002, Thomas stopped working for Columbus. The circumstances of Thomas's departure from Columbus are unclear, but the parting was less than amicable. After Thomas left Columbus, he began his own business consulting in the disabilities field.[3]

## FACTS AND PROCEDURAL HISTORY

Columbus's exclusive contract with the State to staff Arlington was scheduled to expire by its own terms on June 30, 2003. In the early spring of 2003, in anticipation of the expiration of the Columbus/Arlington contract, the State issued requests for proposals ("RFPs") to staff the successor contract. Under State procedures, the State would accept bids from a variety of vendors and evaluate them in light of the needs of the facility. While cost was a significant component of the bidding process, the State also considered the technical requirements and the qualifications of the entity submitting the bid, and it ultimately would award the contract to the overall "best" bid.

Former Columbus employee Thomas, by then an independent consultant, considered bidding on the Arlington contract but decided that it was "a little big" for his newly formed disabilities consulting firm. Thomas contacted Defendant/Appellant Liberty Healthcare Corporation ("Liberty"), a staffing agency similar to Columbus and a competitor of Columbus. Thomas suggested to Liberty that they collaborate to submit a proposal to the State for Liberty to take over the contract to staff Arlington's therapists. Given Thomas's past relationship with Arlington superintendent Johnson, Liberty was persuaded that Thomas could be instrumental in obtaining the contract for Liberty. Liberty agreed with Thomas that, if it were awarded the Arlington contract, Liberty would pay Thomas a $2,000 per month consulting fee for the duration of the contract. Subsequently, Columbus, Liberty, and other vendors submitted proposals to the State for the therapist contract at Arlington.

On March 14, 2003, the State sent Liberty and Columbus letters notifying them that the State intended to award the Arlington contract to Liberty effective July 1, 2003. The letter stated that Liberty was the "apparent best evaluated proposer," but included a proviso that the letter was not an acceptance of any offer, and that the State reserved the right to reject any proposal. Liberty's bid price for the contract was $3.2 million, only $80,000 less than Columbus's bid price. The contract

_____

[3]The record contains no indication that Thomas was subject to a non-competition agreement or other restriction on the use of the knowledge he obtained while employed by Columbus.

to staff Arlington was executed by Liberty on March 26, 2003, and by the State on May 15, 2003. The contract required Liberty to staff thirty-two therapist positions. If Liberty failed to perform under the contract by July 1, 2003, Liberty faced forfeiture of a $500,000 performance bond and liquidated damages of $10,000 per month per position.

Under Tennessee law, once the State has awarded a contract, the losing bidders have thirty days to appeal the award; after that, the contract is officially granted to the best proposer. *See* Tenn. Code Ann. § 12-4-109. Columbus did not appeal the State's award of the Arlington contract to Liberty.

At the time Liberty won the bid to staff Arlington, Columbus employed twenty-two therapists at Arlington, including the nine therapists at issue in this appeal (hereinafter referred to as the "Therapist Defendants"). The Therapist Defendants are Kimberly Crawford, Lynna Jardeleza, Dawn Locke (Locke Wilson), Maria Madarang, Candi McMorran, Stephen Monisit, Liza Pabalate, M.B. "Jun" Pacris, Jr., and Monica Roberts.[4] Each of these Therapist Defendants had signed an employment agreement with Columbus that contained the following non-compete provision:

> During the period of employment and for a period of one (1) year after termination for any reason whatsoever, EMPLOYEE shall not directly or indirectly solicit business from, or agree to provide services to FACILITY. EMPLOYEE shall not seek to induce any person who provides services for EMPLOYER to breach, in whole or in part, a contract or agreement with the EMPLOYER, or to terminate same, or fail or refuse to renew same.
>
> The parties hereto recognize and agree that EMPLOYEE's services pursuant to this Agreement are unique and extraordinary, and that damages incurred by EMPLOYER as a result of EMPLOYEE's breach of previous paragraph would be difficult to ascertain or measure. Accordingly, the parties agree that in the event of a breach of restrictive covenant clause by EMPLOYEE, EMPLOYER will incur minimum liquidated damages of $10,000 if a breach of this Agreement by EMPLOYEE causes actual damages to EMPLOYER in excess of the minimum liquidated damages of $10,000. The parties hereto agree that the sum of $10,000 constitutes a reasonable approximation of the minimum actual damages that would be incurred by EMPLOYER as a result of EMPLOYEE's breach, and that the provisions of this paragraph do not constitute a penalty.

Thus, the non-compete provision states that the employee "shall not directly or indirectly . . . agree to provide services to" Arlington for one year after the termination of his employment with Columbus. It provided for liquidated damages in the event of a breach, stating that $10,000 was "a reasonable approximation of the minimum actual damages" to Columbus resulting from the therapist's breach of the non-compete provision.

---

[4]Therapists Jo A. Palya, Craig Millen, and David B. Hayes were also named as defendants, but Columbus did not recover a judgment against them and they are not involved in this appeal.

After receiving the State's notification of its intent to award the Arlington contract to Liberty, Columbus sent Liberty a letter dated March 19, 2003, informing Liberty that Columbus's therapists at Arlington were subject to the restrictive covenants, and warning that Columbus intended to enforce the covenants. Columbus wrote Liberty that it "expects that, in the event Liberty is ultimately awarded a contract to render services at Arlington, Liberty will continue to respect Columbus' contract rights and refrain from offering employment opportunities to Columbus' employees that violate Columbus' rights." Liberty did not respond to this letter.

In the meantime, Liberty had consulted with independent counsel regarding the non-compete covenants in the Therapist Defendants' contracts and received advice that the covenants were unenforceable. After receiving this opinion, Liberty began to recruit the Therapist Defendants to continue to work at Arlington through Liberty under the new contract. Arlington superintendent Johnson had an interest in maintaining continuity of care for the Arlington residents, was pleased with the therapists' work, and had been in contact with former Columbus executive Thomas, so he encouraged Liberty to recruit incumbent therapists to work at Arlington under the new Liberty contract. Around March 27, 2003, Johnson set up a meeting for the incumbent staff at Arlington to meet with Liberty's Executive Vice President, Rick Robinson ("Robinson"), Liberty's vice president of operations, Karen Peret ("Peret"), and Thomas, there on behalf of Liberty. The Liberty representatives informed the Arlington staff that Liberty had been awarded the successor contract, reassured them about the transition, and invited them to apply for positions with Liberty. Thomas introduced himself as a member of the Liberty team. He began "talking up Liberty" and "presenting them in a favorable light" at Arlington. Some evidence suggests that, at the meeting, Thomas told the incumbent Columbus therapists that the enforceability of their non-compete agreements was questionable, commenting that he had drafted the contracts during his tenure at Columbus and felt they would not stand up in court. To quell their concerns, Thomas and/or other Liberty representatives assured the Arlington employees that Liberty would indemnify them for any losses resulting from Columbus's attempt to enforce the non-compete agreements.

On approximately April 17, 2003, Liberty's recruiting team, consisting of Senior Recruiter Lori (Schultz) Krantz, Ron Johnson, and Peret, visited Arlington to interview candidates to staff the successor contract. Their goal was to retain the incumbent Columbus staff to continue working at Arlington for Liberty. Recruiters asked the employees if they had non-compete restrictions in their employment contracts, and some Columbus incumbents responded that they did. Before each interview proceeded, Liberty required the candidate being interviewed to sign a form letter, dated April 14, 2003 and drafted by Liberty. The form letter stated that Liberty wanted "to discuss with [the employee] the possibility of working together in the future." The letter included a proviso that, by signing it, the employee acknowledged that he or she had "contacted Liberty Healthcare," and that "Liberty did not initiate contact with me." The employee's signature purportedly acknowledged that "Liberty Healthcare has made it clear to me that it is not suggesting that I breach or terminate any existing contract I have for a position at Arlington." Liberty's interviews of the Columbus candidates took place during work hours.

In mid-May of 2003, Liberty presented employment agreements dated May 14, 2003, to the Therapist Defendants, among others. The employment agreements were presented the day before the State executed the successor contract with Liberty.

In a letter dated June 4, 2003, Columbus notified the incumbent Arlington employees that their employment contracts would be terminated as of June 30, 2003. The letter warned the employees that Columbus would take legal action against them if they worked for Liberty at Arlington in violation of their contracts. Columbus representatives also met with some of the Therapist Defendants about Columbus's loss of the Arlington contract, implying that while Columbus might "overlook" the therapists working for the State, Columbus would not "make [it] easy for Liberty" to employ the therapists at Arlington. While Columbus was able to offer alternative employment to some of the therapists who had non-compete agreements, Columbus offered no comparable alternative employment to the nine Therapist Defendants. The Therapist Defendants looked for comparable employment in the same geographic area and beyond, with no success. Finally, despite the warnings from Columbus, on July 1, 2003, the nine Therapist Defendants, among others, began working at Arlington under employment agreements with Liberty.

On December 12, 2003, as promised, Columbus filed a lawsuit against the Therapist Defendants in the trial court below, alleging that the therapists breached their covenants not to compete by providing services at Arlington through Liberty's staffing services. On April 15, 2004, Columbus filed a second lawsuit in chancery court against David Thomas and Liberty, alleging that they unlawfully induced the Therapist Defendants to breach their employment agreements, and that they intentionally interfered with Columbus's existing and prospective business relations with the Therapist Defendants and the State of Tennessee. Columbus's claims of unlawful inducement were brought pursuant to both common law and statute. *See* Tenn. Code Ann. § 47-50-109.[5] Columbus sought compensatory damages, punitive damages, treble damages pursuant to the statute, attorney's fees, and costs. The two cases were consolidated in the trial court below. Columbus later entered into a settlement agreement with Thomas, and on August 24, 2007, a consent order was entered, dismissing Thomas from the lawsuit with prejudice.

The trial court conducted a bench trial of the consolidated cases on August 27 through August 30, 2007. Columbus presented the testimony of Donald Mooney ("Mooney"), the director of operations at Columbus. Mooney explained, in providing employees for state agencies, Columbus bills the client directly and then pays the employees a portion of what it receives from the client based on a previously negotiated salary. The difference is retained by Columbus as its compensation. Mooney testified about the purpose of the covenants preventing the employees from working at Arlington for a year after termination of their employment with Columbus:

---

[5]That statute provides:

> It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages.

Tenn. Code Ann. § 47-50-109 (2001).

A: Columbus's view is that we're protecting the efforts that we've produced there, the recruitment that we've done for these hard-to-fill positions.

The solution that we've provided to our customer, we've gone out and found the solution for the customer, and in some cases, transitioned the employees to that location, and we feel we need to protect that interest that we have.

Q: What does the non-compete protect against? What is your concern when you ask people to sign them?

A: There are a couple things. Obviously, during the term of the contract, we don't want our customer to come and invade our employee base and say, we'd like you to come work for the state, or at that location.

Second, at the end of the contract, and especially in case of this Arlington, where the employee or the succeeding vendor would go around and work with our employees to work for them directly.

Mooney was asked how Columbus had been injured by Liberty hiring its former employees to work at Arlington:

In this case, it really comes down to, you know, our efforts that we've done, the solution that we've provided to our customer. Liberty has gotten the benefit of that solution.

In the case of the [Therapist Defendants], they continued services there without minimum efforts to continue to keep them there. We believe that we would have had an opportunity to potentially negotiate a buyout of those contract rights with the succeeding vendor – Liberty in this case – that we potentially could have negotiated the transition of those [Therapist Defendants].

Thus Mooney testified that the employees' non-compete covenants are intended to protect Columbus from the client hiring the employees directly, or to prevent the employee from working for a successor agency. Liberty's hiring of the Therapist Defendants gave Liberty the benefit of Columbus's efforts in finding and hiring them, and also prevented Columbus from in essence "selling" to Liberty the right to employ the Therapist Defendants to work at Arlington, free from the constraints of the non-compete agreements. Asked about the impact of enforcement of the non-compete provisions on the Arlington residents and the State, Mooney reluctantly agreed that "the less turnover in this situation, the better, for the citizens [of Arlington]," and that, if the incumbent therapists were not permitted to continue working at Arlington, the State would lose its investment in the specialized training of those employees.

Mary Rider, a former Columbus employee, also testified at trial. She said that a fellow Columbus employee called her to meet with Thomas, whom both had known through Thomas's previous employment with Columbus. Thomas told Rider that her Columbus non-compete covenant was unenforceable. Rider attended one of the Arlington employee meetings held by Thomas and Liberty representatives, and she said that she felt as though she was being recruited by Liberty. Rider confirmed that continuity of care was very important to the patients at Arlington because the State had provided training for the incumbents to serve the unique population there.

Liberty's vice president in charge of intellectual and developmental disabilities, Karen Peret, was called by Columbus to testify, and she also testified on Liberty's behalf. Like Columbus, Liberty's business included providing highly educated and specialized occupational therapists, speech therapists, and physical therapists for facilities with patients with intellectual or developmental disabilities. Under questioning by Columbus, Peret conceded that, despite Liberty's awareness of the non-compete covenants, Liberty actively sought to recruit and hire incumbent Columbus employees to staff the new Arlington contract. Peret explained that Liberty's independent counsel had advised Liberty that the non-compete covenants in the Columbus employment agreements were unenforceable. Arlington supervisor Johnson told Liberty that, for the benefit of Arlington's residents, he wanted the incumbent therapists to continue working at Arlington. Peret said that, soon after Liberty was awarded the Arlington contract, Johnson gave the employees Liberty's telephone number and encouraged them to call and ask to keep their job positions at Arlington through Liberty. Peret claimed that most of the incumbent employees first contacted Liberty using the number they had been given by Johnson. Asked about whether Liberty would have had difficulty filling the positions at Arlington had it not hired the Therapist Defendants, Peret insisted that Liberty would nonetheless have been able to fully staff Arlington, and that it had done so in other larger facilities within a short time frame.

In her testimony, Peret said that Liberty paid the former Columbus employees more than it had anticipated paying to fill those therapist positions. However, Arlington superintendent Johnson specifically asked Liberty to keep the Columbus employees at Arlington because of the importance of continuity of care at a facility such as Arlington.[6] She explained that the term "continuity of care" in this context meant more than just avoiding a break in service, but also meant maintaining the same individuals in the therapist positions. She noted that the residential patient population at Arlington was comprised of persons with profound intellectual and physical disabilities, and she emphasized the value of both the highly specialized training the State had provided to the Therapist Defendants and their years of experience in serving the Arlington residents:

> Q. What does the concept "continuity of care" mean to you, the concept that Mr. Johnson mentioned to these employees on, I believe, March 17, 2003?
>
> A. What it meant to me was that the individuals who were at the facility had been trained by some of the best consultants in the country during the previous seven years because of the Consent Decree. They had a tremendous amount of specialty training and information that is almost impossible to match.
>
> So if those people were to leave employment, the clients' daily activity programs and physical supports and occupational therapy and speech supports, particularly with folks with dysphagia, would have suffered.
>
> Now, dysphagia – tell me when you want me to stop.
>
> * * *

---

[6]Johnson corroborated Peret's testimony on this point.

Q. Okay. And what is that?

A. That is difficulty swallowing, which it leads to the number one cause of death for individuals with intellectual and developmental disabilities.

Q. Everyone with – and I can't pronounce it so I won't try, but everyone with this disorder – does everyone react the same, or do people with this disorder react differently when they have problems?

A. They all react differently. There are certain trigger kinds of symptoms that you see in individuals with this particular problem, that if they are not identified – commonly, they are not identified even by professionals – can lead to pneumonia and death.

Q. But if you were dealing with one of these people on a daily basis, it's easier to recognize this problem than if you are coming in new, even though if you come in new and you have specialized training; isn't that correct?

A. Yes, that is very true, because each individual is idiosyncratic, and when you are dealing with this population of people who can't talk to you, what is fundamental in terms of providing services is that you understand when someone, for example, twitches the shoulder, that means they have pain in their leg.

Now, that is not something that you would ordinarily know, regardless of the amount of speciality knowledge or education that you have, because that is an individual experience kind of thing. You have to know "John," if you will, in order to know that this is how he reacts when he has – when he's, for example, constipated, when he has acid indigestion, when any other kinds of symptoms occur.

Peret confirmed Thomas's extensive participation in Liberty's efforts to retain the Arlington staff, even noting her disagreement with Liberty's decision to utilize his services. She indicated that Liberty hired Thomas because of his relationship with Arlington superintendent Johnson and his knowledge related to the personnel at Arlington, believing that including Thomas in Liberty's proposal would enhance Liberty's chances of getting the contract.[7] Peret confirmed that Thomas shared with Liberty and with the employees at Arlington his opinion that the non-compete covenants in the employment agreements with Columbus were not enforceable.[8]

The trial court heard testimony from each of the Therapist Defendants. All were subject to the non-compete covenant and lost their employment with Columbus when Columbus's contract with Arlington was not renewed. None were offered a comparable position with Columbus before the Arlington contract expired in June 2003, despite discussions with Columbus about alternate employment. All conceded that, under the restrictive covenant, Columbus was not obliged to provide alternate employment. Many made efforts to find comparable employment elsewhere in the

---

[7]Thomas apparently gave Liberty salary information about Arlington personnel that, Peret said, turned out to be "grossly inaccurate."

[8]Realizing that Thomas was not an attorney, Liberty got an opinion from independent counsel.

community or even in other states, to no avail. All of the Therapist Defendants ultimately decided to accept Liberty's offer of continued employment at Arlington and indemnification if Columbus took action to enforce the non-compete covenants.

Each of the Therapist Defendants described his or her individual circumstances and efforts at finding alternate employment. Several described their therapy work with the Arlington residents and the hardship that losing their employment at Arlington would have created.

Therapist Defendant Dawn Locke-Willis testified that, at the time that Columbus lost the Arlington contract, she was in a difficult divorce and raising two small children, and was "[g]oing from a double income to a single income and trying to make ends meet." In light of her financial and emotional hardships, she accepted Liberty's offer to continue working in therapeutic services at Arlington.

Defendant Stephen Monisit worked with Columbus as a physical therapist at Arlington. When he and the other Columbus employees were informed by Arlington superintendent Johnson that Columbus's contract was not renewed, Monisit said, Johnson urged them to continue their employment at Arlington through Liberty. A native of the Philippines, Monisit was sending money to the Philippines to support his family and his wife's family. Leaving Arlington, he said, would have resulted in a pay cut of $10,000-$20,000 per year. He described his work with the disabled Arlington residents:

> For the years that I have been with Arlington, I just working with – it's just so – the people that live there are so fragile and it's just really hard to tell. You just have this feeling that you wanted to help them and hopefully improve their lifestyle.
>     They don't have anybody that like us, other people, you know, that they have for their entire life. They just have the staff with them and I just enjoyed working with them.

Defendant Maria Christina Madarang worked for Columbus at Arlington as a physical therapist and also in assistive technology, utilizing specific wheelchairs or other equipment to help Arlington residents with musculoskeletal or other deformities. Also a native of the Philippines, Madarang's father had died and she was providing financial support to her mother in the Philippines. She said that losing her job at Arlington would have been a "tremendous hardship." She confirmed that Arlington superintendent Johnson urged her and the other Columbus employees to continue working at Arlington with Liberty in order to provide "continuity of care for the individuals in Arlington."

Testimony was also given by Defendant Candi McMorran, an occupational therapist at Arlington since 1996. McMorran said that Columbus representatives made it clear that they would enforce the restrictive covenants and "did not want to make it easy for Liberty to come in." After Columbus lost the Arlington contract, McMorran unsuccessfully sought an alternate position with Columbus. She then looked for employment elsewhere in the community, and even interviewed for a position in Kentucky for a job that paid some $20,000 less than her compensation at Arlington. At the time, McMorran's husband was not employed, but was a stay-at-home father, and she had two

children at home and she was pregnant with a third. McMorran ended up accepting Liberty's offer to continue working at Arlington at a slight pay cut.

Defendant Liza Papolate worked at Arlington as a physical therapist, having relocated from the Philippines to Tennessee. She was providing financial support for her family and her husband's family. After Columbus lost the Arlington contract, Papolate pursued alternate employment with Columbus but was not offered a position. At the time, she said, the job market for physical therapists was not good, and leaving Arlington would have resulted in a $15,000-$20,000 per year pay cut. Papolate said that, while at Arlington, she received in-house training provided by consultants hired by the State in "neurodevelopmental techniques," training that was specific to the patient population at Arlington.

The trial court also heard testimony from Therapist Defendant Jo Palya, who had a master's degree and was employed at Arlington in assistive technology. She said that Columbus was "adamant" about enforcing the restrictive covenant, but that it offered her no alternative employment. Working elsewhere would have resulted in a nearly $25,000 per year pay cut for Palya. After noting that Johnson had urged her and the other Columbus employees to remain at Arlington to provide continuity of care to the residents, Palya described the concept of continuity of care as it applied to the "developmentally delayed" population at Arlington:

> It's a little bit different. They tend to make progress and change over a long period of time. So it's very important that the care that's provided is presented in the same manner, a lot of repetition and routine, for them to be able to learn.
>      Any interruption in that, whether it's a change in staff or change in presentation of activities, can affect their ability to learn.

After hearing all of the proof, the trial court took the case under advisement.

On October 26, 2007, the trial court issued a comprehensive memorandum opinion concluding that the non-compete covenants were enforceable, that the Therapist Defendants had breached their employment agreements, and that Liberty had induced those defendants to do so. At the outset of its memorandum opinion, the trial court made extensive findings as to Thomas's conduct and the collaboration between Liberty and Thomas. It noted that Thomas's prior employment with Columbus had given him "insider knowledge" about Arlington and the Therapist Defendants, as well as a working relationship with Arlington superintendent Johnson and the Arlington employees. In discussing Liberty's agreement to pay Thomas $2,000 per month if Liberty were awarded the Arlington contract, the trial court characterized it as having "all of the trappings of a 'kick-back' scheme" calculated to place Liberty in an enhanced position to bid for the Arlington contract. The trial court seemed to discredit Thomas's denial of any role in putting together Liberty's bid for the Arlington contract. It outlined the considerable efforts by Thomas and Liberty to recruit the Therapist Defendants to continue working at Arlington for Liberty, despite knowledge of the restrictive covenants.

The trial court then discussed how enforcement of the restrictive covenants affected the individual Therapist Defendants. It noted the Therapist Defendants' personal circumstances and their "devotion" to the Arlington residents:

> All of [the Therapist Defendants] are well educated and very dedicated professionals. The practicing therapists are truly devoted not only to their chosen profession, but more especially to the individual patients whom they serve. Considering their facial expressions, the tone of voice, and even the choice of words, one comes away with the impression that the work they do is a sort of "servant ministry" for them. One could see it in their faces and hear it in their voices, as they testified.
>
> Several of the individual Defendants are natives of the Philippines. All of them have families remaining in The Philippines whom they support financially from their income, and who are dependent upon that support for their livelihood. One of them . . . experienced the death of her father during the course of the controversy. In giving her testimony about support for her mother, who is still living, she became overwhelmed with emotion to the point it became necessary to take a break in order to allow her to collect herself before she could proceed with the cross-examination.
>
> For another witness, . . . the year 2003 was "not the best year for her." She has two small children and life for her was "a blur" at the time, as she was going through a difficult divorce at the same time she was experiencing the turmoil surrounding the change in her work environment.

The trial court credited the Therapist Defendants's assertions that they did not immediately seek to avoid their non-compete covenants, but first sought other employment opportunities with Columbus and elsewhere. It found that they were constrained by their personal circumstances to accept employment with Liberty, given the understanding that Liberty would indemnify them if Columbus took action to enforce their non-compete covenants:

> According to the testimony of virtually all of the Individual Defendants, after meeting with [Liberty representatives] in mid May, when they were presented with the Liberty employment agreement, they did not immediately sign. Rather, they continued discussions with Columbus about other placement options under their Columbus contract. They sought other opportunities on their own as well. One of them . . . actually was offered an interview in Kentucky for what she thought was an assistant superintendent position, which actually turned out to be a position for a "home manager" at a salary that was some $20,000 below her then existing salary. She declined the job. She explained that her husband was a "stay-at-home dad" with their two small children and she was in her sixth month of pregnancy with their third child at the time. She simply could not afford such a substantial reduction in her income under the circumstances.
>
> For the most part the other Individual Defendants were in the same or similar situation, except they did not receive so much as an interview. The reality for them was that there simply were no jobs available at that time for them to honor their contractual obligation to Columbus. Stated differently, Columbus was not in a position to perform its end of the bargain by furnishing the therapists with ongoing employment at all, much less at a comparable wage. By this point in time the Individual Defendants were placed in the position of blind loyalty to Columbus, which carried with it the prospect of no job at all, or at best a job at substantially

-12-

reduced income. The only alternative was to sign on with Liberty with the assurance
of continued work at [Arlington] and a guaranty of indemnity by Liberty if Columbus
should pursue them legally.
\*\*\*

> To be sure the burden upon the therapists, if precluded from continuing work
at the Center, was difficult. As earlier noted, for some of them, the burden was
virtually intolerable.

The trial court then analyzed the liability of Liberty and the Therapist Defendants under the
legal theories asserted by Columbus. As to the Therapist Defendants, Columbus asserted that they
were liable for breach of the non-compete covenants. As to Liberty, Columbus asserted that it was
liable under the common law and under Tennessee Code Annotated § 47-50-109 et seq. for inducing
the Therapist Defendants' breach of their restrictive covenants.[9]

The trial court first determined that Thomas and Liberty, if liable, would be liable under the
doctrine of joint and several liability, rather than comparative fault, because they worked in concert
with one another in procuring the Therapist Defendants' breach of their employment contracts. It
found that Thomas, though retained by Liberty, was not an employee of Liberty, so Columbus's
settlement and release of Thomas did not operate as a release of Liberty.

The trial court next determined that the non-compete covenants in the Therapist Defendants'
employment agreements were reasonable and enforceable under Tennessee law. The trial court
recognized that Columbus's claims against Liberty hinged on the existence of a legal and binding
non-compete covenant. It found that Columbus had a legitimate business interest to be protected
by the restrictive covenant:

> . . . Columbus incurred recruitment and relocation cost[s] with respect to each
> therapist. In addition to the salary paid to each therapist Columbus provided
> continuing education at no cost to the therapists, some of which included specific
> training for the unique patient population at the Center. . . . [T]hat training was an
> integral part of compliance with the Federal Court Order. Considering the
> specialized training and the unique relationships formed with the patients, it is
> reasonable to conclude that Columbus had a legitimate business interest to protect.

The trial court found further that the client restriction in the covenant was reasonable. In evaluating
the burden on the Therapist Defendants, the trial court noted that the burden for all was "difficult"
and for some could be characterized as "intolerable." Nevertheless, it found that this burden on the
Therapist Defendants was "outweighed" by the "egregious" conduct of Thomas and Liberty:

> Thomas knew that the opportunity for securing comparable employment for the
> therapists would be difficult. But it would not have been impossible. Indeed,
> Columbus had placed 22 of the 32 therapists in other positions. By offering a
> guarantee of indemnity to the therapists against enforcement by Columbus, Thomas

---

[9] *See supra*, note 4.

-13-

and Liberty removed all risk as well as the burden for the therapists. Thus, the burden to the therapists was outweighed by the tortious interference of Thomas. Working in concert with Liberty, in the final analysis, by creating in essence an unfair bidding process which gave Liberty an unwarranted competitive edge.

The trial court found that Thomas and Liberty acted with intent to induce breach of the non-compete covenants. Thomas, it found, acted with malicious intent to "hurt his former employer" Columbus, and Liberty knew this and was a "willing participant."

Based on these findings, the trial court held that the Therapist Defendants had breached their non-compete agreements with Columbus, and that Liberty was liable to Columbus for inducing the breach under both statutory and common law theories of liability. The court rejected the argument that the $10,000 liquidated damages clause in the employment agreements was a penalty. It held that each of the Therapist Defendants were liable to Columbus for the amount of liquidated damages of $10,000, or a total of $90,000.[10]

In light of the lack of proof submitted by Columbus on the amount of actual damages, the trial court found that the actual damages as to Liberty were the $10,000 in liquidated damages under the non-compete agreements. The trial court held that Liberty's conduct warranted treble damages of $270,000 ($90,000 actual damages x 3) under Section 47-50-109. It also held that Liberty's conduct warranted an award of $270,000 in punitive damages under the common law. Noting that Columbus was not entitled to recover both punitive and statutory treble damages in the same cause of action, the trial court awarded Columbus a total damage award against Liberty in the amount of $270,000.

Thus, the trial court found the Therapist Defendants liable for a total of $90,000 ($10,000 each) in liquidated damages for breaching the employment agreement, and it held Liberty liable for a total of $270,000 in exemplary damages for inducement of the breach. On November 26, 2007, the Therapist Defendants and Liberty filed a motion to alter or amend the judgment, which was denied. From this order, Liberty and the Therapist Defendants (collectively, "Appellants") now appeal.[11]

### ISSUES ON APPEAL

On appeal, Appellants argue that the trial court erred in several respects. Their main contention is that the non-compete covenant in the Therapist Defendants' employment agreements is not enforceable, because Columbus had no legitimate business interest to protect, particularly after its contract with Arlington expired on June 30, 2003. They assert that, even if Columbus had a legitimate business interest, it was outweighed by the economic hardship on the Therapist

---

[10]The non-compete covenant for one Therapist Defendant, Jo Palya, was different and did not have a liquidated damages provision. Palya was found not liable to Columbus. This holding was not appealed.

[11]On March 13, 2008, this Court entered an order consolidating the appeals of Liberty and the Therapist Defendants. These parties' arguments were presented together in a joint brief.

-14-

Defendants and the risk of harm to the public. Furthermore, Appellants claim, no evidence supported the trial court's conclusion that Liberty acted inappropriately in the bidding process, or that it acted maliciously in causing Columbus to lose its contract with Arlington. The tortious interference claim also cannot be maintained, Appellants contend, because Columbus proved no damages as a result of Liberty's conduct. The Appellants also argue that the trial court erroneously applied the doctrine of joint and several liability, rather than engaging in a comparative fault analysis. Finally, the Appellants argue that the trial court erred in calculating damages in holding them liable for treble and punitive damages, and in determining that the liquidated damages provision in the employment contracts was not a penalty.

## STANDARD OF REVIEW

Because this case was decided by the trial court, we review the trial court's findings of fact *de novo* on the record, presuming those facts to be correct unless the evidence preponderates otherwise. *Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 644 (Tenn. Ct. App. 1999); Tenn. R. App. P. 13(d). The trial court's credibility assessments are entitled to great weight on appeal, because the court had the opportunity to hear the testimony and observe the demeanor of the witnesses. *See C & W Asset Acquisition, LLC v. Oggs*, 230 S.W.3d 671, 676 (Tenn. Ct. App. 2007). Therefore, we will not reevaluate a trial court's factual findings based on witness credibility absent clear and convincing evidence to the contrary. *Id.*; *see also Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). The trial court's conclusions of law are reviewed *de novo*, without any presumption of correctness. *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993).

## ANALYSIS

We note at the outset of our analysis that Columbus did not appeal the award of the Arlington contract to Liberty. Consequently, any conduct of either Liberty or Thomas in securing the Arlington contract for Liberty is not at issue. Damages incurred by Columbus by reason of its loss of the Arlington contract are likewise not at issue. Although Columbus apparently settled its claims against Thomas prior to trial, his conduct obviously remains relevant to the issues at trial. However, there is no evidence in the record that, after leaving his employment with Columbus, Thomas was prohibited by agreement or otherwise from utilizing the information he learned about operations at Arlington or his relationship with Johnson or the Columbus employees for his own gain or for the benefit of Liberty in securing the Arlington contract. Columbus has made no allegation that Thomas's use of "insider" information was unlawful. The only basis for liability of the individual Therapist Defendants is breach of the non-compete covenants in their employment agreements with Columbus. The only basis for liability of Liberty is for inducement of any such breach.

### Enforceability of Restrictive Covenant

The trial court correctly observed that Columbus's claims "hinge[] upon the existence of a legal and binding contract between Columbus and the [Therapist] Defendants." Thus, we first address the Appellants' argument that the non-compete covenant in the Therapist Defendants' employment agreements is not enforceable. Generally, covenants not to compete are disfavored in

Tennessee but will be enforced if "they are deemed reasonable under the particular circumstances." *Allright Auto Parks, Inc. v. Berry*, 409 S.W.2d 361, 363 (Tenn. 1966); *see Baker v. Hooper*, 50 S.W.3d 463, 469 (Tenn. Ct. App. 2001). While "[t]here is no inflexible formula for deciding the ubiquitous question of reasonableness," *Allright Auto Parks*, 409 S.W.2d at 363, the Tennessee Supreme Court has described the analysis to be used:

> In general, covenants not to compete are disfavored in Tennessee. *See Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 471, 472 (Tenn. 1984). These covenants are viewed as a restraint of trade, and as such, are construed strictly in favor of the employee. *Id.* However, if there is a legitimate business interest to be protected and the time and territorial limitations are reasonable then non-compete agreements are enforceable. *Id.* at 473. Factors relevant to whether a covenant is reasonable include: (1) the consideration supporting the covenant; (2) the threatened danger to the employer in the absence of the covenant; (3) the economic hardship imposed on the employee by the covenant; and (4) whether the covenant is inimical to the public interest. *Id.* at 472-73 (citing *Allright Auto Parks, Inc. v. Berry*, 219 Tenn. 280, 409 S.W.2d 361, 363 (1966)). Also, the time and territorial limits must be no greater than necessary to protect the business interest of the employer. *Allright Auto Parks*, 409 S.W.2d at 363.

*Murfreesboro Med. Clinic, P.A. v. Udom*, 166 S.W.3d 674, 678 (Tenn. 2005). In considering the relevant factors, "a threshold question is whether the employer has a legitimate business interest, *i.e.*, one that is properly protectable by a non-competition covenant." *Vantage Tech.*, 17 S.W.3d at 644. "The basic requirement for enforceability of a covenant not to compete is the existence of a legitimate business interest which is properly protectable and is actually protected by the agreement. There is no legitimate interest in protection from competition, only from unfair competition." *Gritman & Assoc., Inc. v. St. Amour*, No. M2005-00936-COA-R3-CV, 2007 WL 1241255, at *6 (Tenn. Ct. App. Apr. 27, 2007) (citing *Udom*, 166 S.W.3d at 678).

Thus, in the instant case, we must ascertain whether Columbus has a legitimate business interest that is protectable by the non-compete covenant at issue. If the employer has such a legitimate business interest, we must then determine whether the non-compete provision is reasonable and enforceable under the circumstances of this case. If the court finds that the employer does not have a legitimate protectable business interest, then the non-compete covenant is unenforceable under Tennessee law. *See Corbin v. Tom Lange Co.*, No. M2002-01162-COA-R3-CV, 2003 WL 22843167, at *6 (Tenn. Ct. App. Dec. 1, 2003).

### Legitimate Business Interest

In determining whether Columbus in this case has a legitimate protectable business interest, we are guided by the Supreme Court's analysis in *Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 471, 473 (Tenn. 1984), in which the Court observed:

> Of course, any competition by a former employee may well injure the business of the employer. An employer, however, cannot by contract restrain ordinary competition.

-16-

In order for an employer to be entitled to protection, there must be special facts present over and above ordinary competition. These special facts must be such that without the covenant not to compete the employee would gain an unfair advantage in future competition with the employer.

(Citations omitted). Therefore, Columbus must show special facts beyond protection from ordinary competition that would give *the employee* an unfair advantage in competing with the employer. This Court elaborated on this requirement in ***Vantage Tech***:

Considerations in determining whether an employee would have such an unfair advantage include (1) whether the employer provided the employee with specialized training; (2) whether the employee is given access to trade or business secrets or other confidential information; and (3) whether the employer's customers tend to associate the employer's business with the employee due to the employee's repeated contacts with the customers on behalf of the employer. These considerations may operate individually or in tandem to give rise to a properly protectable business interest.

***Vantage Tech.***, 17 S.W.3d at 644 (citations omitted). Thus, with due consideration to the three ***Vantage*** factors, "the employer must show 'special facts present over and above ordinary competition' such that the employee would have an unfair advantage over the employer absent the noncompetition agreement after his employment has ended." ***Corbin***, 2003 WL 22843167, at *6 (quoting ***Hasty***, 671 S.W.2d at 473 (citation omitted)).

It should be noted at this juncture that the analysis focuses on the employer and the employee who are parties to the non-compete agreement. The conduct of other players in this scenario, such as Thomas and Liberty, may be relevant background, but ultimately has limited relevance to the determination of whether the employer has a legitimate protectable business interest and whether the covenant is reasonable and enforceable.

The trial court in this case determined that Columbus had a legitimate protectable business interest in light of its recruitment and relocation costs for the Therapist Defendants, the specialized training provided by Columbus, and the unique relationships formed between the Therapist Defendants and the patients at Arlington. The specialized training, the court found, "was an integral part of compliance with the Federal Court Order."

On appeal, the Appellants argue that the trial court erred in reaching this conclusion because recruitment costs and goodwill do not fall into any of the legally cognizable business interests recognized in Tennessee as outlined in ***Vantage***. In addition, the specialized training to which the trial court referred was provided by the State, not by Columbus. The investment in training, therefore, is not a legitimate business interest of Columbus. *See Girtman*, 2007 WL 1241255, at *7-8. Furthermore, the Appellants argue, any investment by Columbus in these Therapist Defendants would be lost regardless, because Columbus's contract with the State to staff Arlington expired by its own terms on June 30, 2003. Consequently, Columbus had no legitimate business interest in enforcing the non-compete covenants after that date.

-17-

In response, Columbus argues that the universe of legitimate business interests is not limited to the three enumerated in *Vantage*; the *Vantage* court simply held that an employer seeking to enforce a non-competition covenant must show the existence of "special facts over and above ordinary competition." *Vantage Tech.*, 17 S.W.3d at 644. In any event, Columbus argues, ample evidence supported the trial court's finding that the non-compete covenant in this case protected Columbus's investment in specialized training and its customer relationships. Columbus concedes that the State paid for the Therapist Defendants' specialized training, but claims that the training was made possible by their employment with Columbus and notes that the Therapist Defendants were paid by Columbus during the training. Columbus also relies on cases from other jurisdictions that have recognized a staffing agency's legitimate protectable business interest in preventing "opportunistic disintermediation," that is, either the improper elimination of the staffing agency as the "middle man" or the appropriation of the staffing agency's services without proper compensation. Based on the facts of this case, Columbus argues, it had a legitimate business interest in restricting the Therapist Defendants' employment as prescribed in their non-compete agreements.

The question of whether "opportunistic disintermediation" is recognizable as a legitimate business interest protectable by a restrictive covenant has not been addressed by a Tennessee appellate court. An explanation of the concept is helpful to an understanding of the Appellants' argument on appeal.

The seminal case on this issue appears to be *Consultants & Designers, Inc. v. Butler Serv. Group, Inc.*, 720 F.2d 1553 (11 Cir. 1983) ("*C & D*"). In *C&D*, Butler Services Group ("Butler"), an employment agency for technical service employees, contracted to supply technical employees to the Tennessee Valley Authority ("TVA"). The TVA contract was set to expire on May 3, 1980. Butler's contract with its employees contained a non-compete provision similar to the one in the instant case, restricting the employees from accepting employment with the TVA directly or indirectly for ninety days following the completion of their assignments. *C & D*, 720 F.2d at 1556. Sometime in 1979, the TVA requested proposals from several technical service employment agencies, including plaintiff Butler and defendant C & D, to supply employees upon the expiration of Butler's contract. C & D was awarded the TVA staffing contract. Subsequently, C & D began soliciting Butler's employees at TVA to staff the new contract. Butler put C&D on notice that it would seek to enforce the non-compete provision in the employees' contracts. *Id.* at 1555-56.

Butler filed a lawsuit against C & D in federal court for tortious interference with its contract with its employees.[12] Applying the "reasonableness" standard utilized in Tennessee and other states, the federal district court held that the non-compete covenants were unenforceable.[13] The Eleventh

_____

[12] Butler's lawsuit was brought in a New York district court. Later, C & D and several of Butler's former employees filed an anti-trust lawsuit against Butler in an Alabama federal district court, claiming that Butler's enforcement of the non-compete covenant violated anti-trust laws. The tortious interference case and the anti-trust case were consolidated and tried in Alabama. *See C & D*, 720 F.2d at 1556-57.

[13] The parties agreed that the case was to be governed by the laws of either New Jersey, Alabama, or Tennessee, depending on the circumstances. Both the district court and the appellate court found that there was no significant

(continued...)

Circuit reversed, finding that Butler had a legitimate protectable business interest in preventing its employees and others from appropriating Butler's services as "the much maligned but time-honored middleman" without compensation. *Id.* at 1557. The appellate court explained that an employment agency, as the middleman, provides costly and valuable information to both individuals seeking employment and to the businesses seeking skilled employees:

> While in a technical sense the relationship between Butler and its job shoppers was employer-employee, this characterization of the relationship does more to obscure the relevant issues than to enlighten them. It is more revealing to recognize Butler's role as that of the much maligned but time-honored middleman. Butler served as an intermediary in the market for highly-skilled, technically-trained workers. There were individuals seeking such employment and firms seeking to employ them. In a pristine world in which information is costless, there would be no need for the essential service that Butler performs. The client firms and the prospective employees would each know what the other has to offer and could negotiate a contract instantaneously and costlessly. That, however, is not the nature of the world in which we live. Butler and C & D, and the fifteen other firms that applied for the contract with TVA, as well as a myriad of other firms in the technical service and related industries, exist and flourish because information is a costly and valuable commodity.
>
> Whatever ancillary services Butler supplied to TVA, it was as a provider of information that Butler performed its essential function. Butler's role was to gather, distill, and provide to TVA information on available and suitable people for TVA's positions and simultaneously to provide to prospective job shoppers information about TVA and the positions it was offering. Thus, in this sense, Butler was serving as a form of an employment agency. In the market for the information in which Butler dealt, it had to compete with: (1) all other technical service firms; (2) conventional employment agencies; and (3) disintermediation by firms and workers. Disintermediation is the actualization of the ever-present cry to eliminate the middleman, i.e., direct solicitation, negotiation and contracting between the firm and the worker. Eliminating the middleman is at first blush a facile and attractive alternative. However, middlemen exist because they provide a useful and highly-valued service. If Butler's covenant with its job shoppers is to have any justification, that justification must be to protect Butler's role as a middleman in the market for information between job shoppers and client firms.

*Id.* at 1558. Thus, the *C&D* court found that Butler's role as middleman between the employee and the employer had value that warranted protection.

---

[13](...continued)
difference in the laws of these three states, as each state relied on the concept of reasonableness as the touchstone of the analysis. The district court quipped that its task was to "sail into that cherished legal haven, 'Is [the non-compete covenant] reasonable under the circumstances?' " *See C & D*, 720 F.2d at 1557 (noting that the district court relied on the Tennessee case, *Allright Auto Parks*, 409 S.W.2d at 363).

The *C&D* court explained that, once an employee has been placed with a client business, absent some contractual obstacle, the employee and the client business would be free to sever their relationship with the employment agency and "cut out the middleman." The non-compete restriction in the employees' contracts, the *C&D* court reasoned, was crafted to prevent such "opportunistic disintermediation":

> The covenant between Butler and TVA not to hire one another's employees and the restrictive covenants in Butler's contracts with its job shoppers were clearly crafted to prevent such disintermediation. But for these contractual constraints the job shoppers and the TVA could get the benefit of Butler's services without paying the full price of those services. The application of Butler's restrictive covenant after the termination of its contract with TVA was designed to protect against TVA terminating Butler and then hiring either directly, or indirectly through another technical service firm, the Butler job shoppers. TVA had the power and the right to terminate Butler, but not to abrogate Butler's property interest in its job shoppers. Butler's rights under its employment contracts need not have been enforced. They could have been sold. Regardless of whether Butler would have struck a deal with the job shoppers, TVA, or the successor TSF, Butler was nonetheless protected by the covenant from opportunistic termination of the relationship by TVA. Therefore we conclude that Butler had a legitimate interest in protecting from opportunistic appropriation its investment in acquiring the information necessary to carry on its business, and that the covenant was reasonably well crafted to carry out that task.

*Id.* at 1559. Thus, the Eleventh Circuit found that Butler had a legitimate enforceable business interest in preventing opportunistic appropriation of Butler's investment in its employees and in procuring the information necessary to carry on its business. After weighing Butler's business interest against the effect of the non-compete covenant on the general public, the *C&D* court determined that the non-compete covenant was reasonable and enforceable.[14] *Id.* at 1559-60.

Adopting the reasoning in *C & D*, the federal district court in *Borg-Warner Protective Servs. Corp. v. Guardsmark, Inc.*, 946 F. Supp. 495 (E.D. Ky. 1996), similarly determined that an employment agency had a legitimate protectable business interest in enforcing the non-compete covenants of former employees. In that case, employment agency Guardsmark contracted with client The Gap to provide security guards at one of The Gap's facilities. Guardsmark recruited the security guards, did extensive screening, and provided significant training. When Guardsmark's contract with The Gap expired, The Gap awarded the security guard staffing contract to a Guardsmark competitor, Borg-Warner. Borg-Warner then proceeded to hire the Guardsmark security guards to work at the Gap facility, promising the security guards that it would provide a defense in the event

---

[14]The non-compete covenants in *C&D* were for a ninety-day period. The *C&D* court found that the adverse effect on the employees was not sufficient to render the restrictive covenants unenforceable. As to the public interest, the *C&D* court found that the public gained from enforcement of the covenant because it encouraged a staffing agency such as Butler to invest more effort into finding qualified employees for TVA. *C&D*, 720 F.2d at 1559-60.

that Guardsmark attempted to enforce its non-compete covenants.[15] ***Borg-Warner***, 946 F. Supp. at 497. Borg-Warner filed a lawsuit in Kentucky federal court challenging the validity of the non-compete covenants as unenforceable and as an unreasonable restraint on trade.[16]

In addressing whether the non-compete covenants were enforceable under Kentucky and Tennessee law, the district court noted that the issue presented a conflict between the fundamental policy supporting parties' freedom to contract and the policy disfavoring contractual restraints of trade. *Id.* at 500. Citing the Tennessee Supreme Court case of ***Central Adjustment Bureau, Inc. v. Ingram***, 678 S.W.2d 28 (Tenn. 1984), the court observed that recent cases placed an "emphasis on the employer's investment in the employee and have evolved [into] an approach balancing the importance of that factor against the hardship to the employee and the public interest." *Id.* at 500 n.6; *see Central Adjustment Bureau, Inc. v. Ingram Assocs., Inc.*, 622 S.W.2d 681, 685-86 (Ky. Ct. App. 1981) (enforcing non-compete covenants because the service provided was highly specialized, and because the employer expended considerable time, effort, and money in training the employees in the business). Citing *C & D*, the ***Borg-Warner*** court found that Guardsmark had a legitimate business interest in protecting itself from opportunistic disintermediation by employees, clients, or competitors. The court described the term "disintermediation," as "a twenty-dollar word meaning to cut out the middleman" without compensation for its services. ***Borg-Warner***, 946 F. Supp. at 502. After weighing this business interest against the hardship to the employees and to the public, the court determined that the non-compete covenant was reasonable and enforceable.[17] *Id.*; *see also Aerotek, Inc. v. Burton*, 835 So. 2d 197, 201 (Ala. Civ. App. 2001) (recognizing the employment agency's business interest in disintermediation, citing *C & D*); *Elite Cleaning Co. v. Capel*, No. Civ.A. 690-N, 2006 WL 1565161, at *8 (Del. Ch. 2006) (recognizing a legitimate interest in preventing disintermediation, but finding that such interest was weak in the case of unskilled janitors); *Volt Servs. Group v. Adecco Employment Servs., Inc.*, 35 P.3d 329, 334 (Or. Ct. App. 2001) (recognizing the concept of disintermediation as a legitimate business interest sufficient to support a non-compete covenant).

We are persuaded by these authorities that the avoidance of such an opportunistic disintermediation should be recognized as a legitimate business interest protectable by a non-compete covenant. As the *C & D* court recognized, the nature of an employment agency's business is unique in that its main service is to provide the "costly and valuable commodity" of time, effort, and expense in finding and putting together prospective employees and employers and negotiating contracts related to their employment. Non-compete provisions may be included in the employees'

---

[15]The employees' non-compete clauses provided that, for one year following their employment, the Guardsmark employee would not provide services for any business at which it had provided services through Guardsmark during the previous year.

[16]Guardsmark first filed suit in a Tennessee state court and obtained preliminary injunctive relief. Nevertheless, the federal lawsuit proceeded and the district court considered the issue of whether the non-compete covenants were enforceable.

[17]Guardsmark offered each of its Gap security guards employment at another facility. The court noted that the scope of the non-compete was limited to the specific client site where the employee worked, and found also that the security guards were low-level employees who could easily find comparable employment elsewhere. ***Borg-Warner***, 946 F. Supp. at 797, 502.

contracts to protect the agency's investment by preventing unfair disintermediation, i.e., usurpation of the agency's role by the client hiring the employees directly or through another employment agency. Thus, to the extent that an employment agency has invested resources with respect to a particular employee, the agency may have a legitimate business interest in protecting itself against unfair disintermediation.

We now turn to Columbus's business interest with the Therapist Defendants. Here, Columbus had little investment of its resources into the specialized training of the Therapist Defendants. Columbus did pay the employees while they received the training, albeit with the normal reimbursement by the State. However, the training was required by and paid for by the State, not by Columbus. The training was not just for Columbus employees; all employees at Arlington underwent training so that they could serve the unique patient population at Arlington in a manner consistent with the federal court order governing Arlington.

The factor of whether the Therapist Defendants are the "face" of Columbus is complicated somewhat by the unique role of an employment agency. Columbus's customer here is Arlington and the State, not the individual patients with whom the Therapist Defendants developed relationships. Arlington was, of course, always mindful that the Therapist Defendants were staffed through Columbus. In fact, Arlington remained a client of Columbus for purposes of staffing behavioral and psychology positions. However, the Therapist Defendants' relationships with the Arlington patients obviously motivated Arlington to try to keep the Therapist Defendants working at the Arlington Center. The Therapist Defendants were not traditional employees; rather, because Columbus is an employment agency, they were part of the "product" or service sold by Columbus. Thus, the Therapist Defendants' relationship with the patients were part of their value to Columbus. This could constitute a "special fact" that, under *Hasty v. Rent-A-Driver*, could give "the employee . . . an unfair advantage in future competition with" Columbus in the absence of a non-compete agreement. *Hasty*, 671 S.W.2d at 473.

The Appellants argue that, because Columbus lost the bid for the Arlington contract, Columbus would have lost its investment in the Therapist Defendants regardless of whether they were later hired by Liberty. This is true and could in the final analysis affect the weight given to Columbus's business interest. However, in evaluating whether Columbus has a legitimate protectable business interest, we must consider the circumstances at the time the parties entered into the employment agreement. If Columbus does its job well and places capable employees with its client, the non-compete covenant provides powerful motivation for the client to keep Columbus as its staffing agency. The fact that the non-compete did not, in this instance, sufficiently motivate the State to award the bid to Columbus does not mean that Columbus had no legitimate protectable business interest.

Without using the "twenty-dollar" term, the trial court in effect found that Columbus had a legitimate business interest in preventing unfair disintermediation by Liberty through its recognition that Columbus had incurred recruitment and relocation costs with respect to the Therapist Defendants. This finding is supported by evidence showing that Columbus, as the employment agency, provided the typical employment agency services of recruiting the employees and negotiating their employment conditions with the client, Arlington. Overall, we find that the preponderance of the evidence supports the trial court's conclusion that Columbus had a legitimate

business interest and that Columbus could, under appropriate circumstances, protect its investment through the use of non-compete covenants. We consider, then, whether Columbus can protect its business interest in the Therapist Defendants under the circumstances in this case.

## Reasonableness Under Circumstances of Case

Having determined that Columbus has a legitimate business interest that is protectable under the non-compete covenant in the Therapist Defendants' employment contracts, we must next determine whether the covenant is reasonable and enforceable under the circumstances of this case. This is done by balancing Columbus's business interest against the hardship enforcement would impose on the Therapist Defendants and the risk of harm to the public interest.[18] ***See Udom***, 166 S.W.3d at 678-84 (holding that the physician's non-compete agreement was unenforceable because public policy considerations outweighed the employer's business interest); ***see also Allright Auto Parks***, 409 S.W.2d at 364 (holding that the non-compete covenant is unenforceable because the threatened competition to the employer did not outweigh "the undue oppression that would befall the defendant").

### *Hardship on Employees*

The trial court made detailed findings of fact regarding the hardship that would result to the Therapist Defendants from enforcement of the non-compete covenants. The trial court described the Therapist Defendants as highly educated and "devoted" to the Arlington patients. It recounted many of their personal circumstances at the time this controversy arose, such as having family members in the Philippines relying on their financial support or going through a difficult divorce while supporting small children. The trial court found that the Therapist Defendants did not immediately accept Liberty's offer of employment; they had discussions with Columbus about alternative employment with Columbus, and sought comparable employment in the community and beyond. None were offered alternate employment by Columbus,[19] and any employment elsewhere was at salary levels substantially less than their salary at Arlington.

The trial court found that, after Columbus's contract with Arlington was not renewed, the Therapist Defendants "were placed in a position of blind loyalty to Columbus, which carried with it the prospect of no job at all, or at best a job at substantially reduced income." Based on these circumstances, it found that "the burden upon the [Therapist Defendants], if precluded from continuing work at [Arlington] Center, was difficult. . . . [F]or some of them, the burden was virtually intolerable."

The trial court then went on to find that Thomas and Liberty improperly seized on the vulnerability of the Therapist Defendants by agreeing to indemnify them for any loss resulting from

---

[18]The time and territorial limits are not challenged in this case.

[19]Columbus correctly pointed out to the trial court that, under the non-compete provisions, it was not contractually obligated to offer the Therapist Defendants alternate positions or find employment for them elsewhere. Columbus's failure to do so, however, has obvious impact on the hardship of the Therapist Defendants that would result from enforcement.

the breach of their non-compete covenant. It concluded that "the burden to the therapists was outweighed by the tortious interference of Thomas working in concert with Liberty in the final analysis, by creating in essence an unfair bidding process which gave Liberty an unwarranted competitive advantage." Thus, after finding that enforcement of the non-compete agreements would result in nearly "intolerable" hardship to the Therapist Defendants, the trial court found that this hardship was nullified by the indemnification agreements allegedly improperly offered by Liberty for predatory practices.

Respectfully, in evaluating the reasonableness and enforceability of the Therapist Defendants' non-compete covenants, the trial court's analysis of the hardship to the employees should have ended with its conclusion that the burden on the Therapist Defendants was "difficult" or "intolerable." The contract is between Columbus and the Therapist Defendants, and they remain the focus of the analysis at this point. Any conduct by Thomas or Liberty, including any promise to indemnify the Therapist Defendants in the event of enforcement by Columbus, is largely irrelevant to the issue of whether the hardship to these individuals outweighs Columbus's legitimate business interest in enforcing the non-compete covenant.[20]

A preponderance of the evidence supports the trial court's finding that the enforcement of the non-compete covenant by Columbus placed a heavy burden on the Therapist Defendants. Under these circumstances, we find that the record supports a finding that the hardship imposed on the Therapist Defendants by enforcement of the non-compete covenant was onerous.

### *Public Interest*

In the balancing equation to determine if the non-compete covenant is reasonable and enforceable in this case, we also consider whether enforcement of the covenant would be "inimical to the public interest." *Udom*, 166 S.W.3d at 678.

This factor was considered by the court in *C&D*, cited above, in evaluating Columbus's business interest in avoiding "opportunistic disintermediation." The *C&D* court found in that case that the public overall benefitted from the ability of the employment agency to protect its investment in the TVA employees ("job shoppers"). *C&D*, 720 F.2d at 1559-60. The *C&D* court stated:

> The protection that Butler believed it acquired as a result of this restrictive coverage permitted Butler to invest at a level closer to the optimum in the assets required to find personnel for TVA. By protecting the future stream of income that Butler would receive from its job shoppers, Butler was induced to invest more in searching for job

---

[20]We also note that in *C&D*, the Eleventh Circuit stated that, in evaluating the adverse impact of enforcement of the non-compete on the employees or on the public interest, "[t]he proper posture from which this inquiry is to be undertaken is not after the termination of [the employment agency's contract with the client] (ex post), but rather before the formation of the contracts [between the employment agency and its employees, and between the employment agency and its client] (ex ante)." *C&D*, 720 F.2d at 1559. We respectfully disagree. While the circumstances at the time the contract were executed are certainly part of the analysis, we must also look at whether the non-compete covenants are reasonable and enforceable as applied under the circumstances that exist at the time of enforcement.

shoppers than it otherwise would.  Thus the public at large can be expected to gain from the enforcement of this and similar restrictive covenants to the extent that these covenants encourage optimal investment.

*Id.* at 1560.[21]  In light of the benefit to the public of encouraging the employment agency to invest in finding qualified personnel, the *C&D* court found that the non-compete covenants in that case were reasonable and enforceable.  *Id.*

Likewise, in this case, the public has an interest in encouraging an employment agency such as Columbus to invest resources into finding and securing qualified therapists to work with the patient population at Arlington.  Permitting enforcement of the non-compete covenants serves this purpose.

We must also consider, however, the impact that enforcement of the non-compete covenants would have on the State, on Arlington, and on Arlington's vulnerable patient population.  In the trial court's thorough analysis, it noted that, in ascertaining whether a restrictive covenant is reasonable and enforceable, Tennessee courts are to evaluate, among other factors, the impact that enforcement of the covenant would have on the public interest, and cited *Allright Auto Parks, Inc. v. Berry*, 409 S.W.2d 361, 363 (Tenn. 1966).  Surprisingly, however, the trial court did not thereafter mention the impact that enforcement of Columbus's non-compete covenant would have on the State or on the Arlington patients.  We consider this to be a highly significant factor in this case.

As noted by the Tennessee Supreme Court in discussing restrictive covenants for physicians, "restrictive covenants in the medical profession raise concerns regarding the public good." *Udom*, 166 S.W.3d at 679.  The *Udom* Court emphasized that the services provided by medical professionals such as physicians go "well beyond merely providing goods or services." *Id.* at 683.

The evidence is undisputed that, once Columbus lost the Arlington contract, Arlington superintendent Jerry Johnson urged the Therapist Defendants to remain at Arlington through Liberty in order to maintain continuity of care for the residents.  Witness after witness discussed the importance of continuity of care to the severely compromised patient population at Arlington, and that "continuity of care" to them meant not simply keeping therapist positions filled, but also, as much as possible, keeping the *same individuals* in those positions.  Therapy frequently required repetition and routine over a long period of time, with any change in staff or presentation significantly affecting the patients' ability to learn and progress.  Moreover, with a population of patients who "can't talk to you," therapists are required to understand the individual patients' idiosyncrasies, sometimes with respect to potentially life-threatening conditions such as dysphagia.

_____

[21]The *C&D* court appeared to assume that the "job shoppers" would not lose their TVA jobs as a result of enforcement of the 90-day covenant not to compete.  It appeared to assume instead that the replacement employment agency would have "purchased" a "waiver" of the employees' non-competes from Butler.  *C&D*, 720 F.2d at 1559.  We respectfully disagree with this aspect of the *C&D* court's analysis.  The contract at issue is between the employment agency and the employee and the focus is the burden created by enforcement, not whether a third party would have paid the employment agency to waive its contractual rights.

Thus, the loss of even one therapist has a significant adverse impact; the loss of an entire group such as the Therapist Defendants, could be very serious indeed.

Moreover, in this case, we must consider the State's significant investment in the specialized training given to the Therapist Defendants. The evidence was undisputed that the training provided by the State was provided in order to comply with the mandates of the federal order regarding Arlington, and was specifically tailored to teach the Therapist Defendants the best practices in caring for the unique patient population at Arlington. If the non-compete covenant were enforced against the Therapist Defendants, the State would lose its investment. Even more important, the vulnerable Arlington residents would lose the benefit of the highly specialized training.

Columbus does not dispute the impact to the Arlington patients of the disruption of continuity of care, or the value of the specialized training provided by the State. Rather, it emphasizes the other side of the same coin, that is, that the "special relationship" between the Therapist Defendants and the Arlington patients, and the training given to the Therapist Defendants, were part of their value to Columbus and part of Columbus's protectable business interest.

In a purely commercial setting, we would come closer to agreeing with this analysis. In this case, however, the "special customer relationship" is in a medical setting with especially vulnerable patients whose interests must be safeguarded. Moreover, the training was provided by the State for the benefit of those patients. These circumstances clearly implicate the public interest.

As stated in *C&D*, "[t]he question before us is whether on balance the public gained or lost as a result of" Columbus's ability to protect its investment and enforce the non-compete covenants against the Therapist Defendants in this case. *C&D*, 720 F.2d at 1559. While the benefit of inducing Columbus to invest resources into finding qualified therapists to work at Arlington is not inconsequential, in this case, it is far outweighed by the adverse impact of disrupting the continuity of care for the Arlington residents and the loss to the State and the Arlington patients of the State's investment in the Therapist Defendants' specialized training. Thus, we find on balance that enforcement of the non-compete covenants would be "inimical to the public interest." *Udom*, 166 S.W.3d at 678.

## CONCLUSION

As noted above, to make the ultimate determination of whether a restrictive covenant is reasonable and enforceable, the factors to be considered include: "the threatened danger to the employer in the absence of the covenant; . . . the economic hardship imposed on the employee by the covenant; and . . . whether the covenant is inimical to the public interest." *Udom*, 166 S.W.3d at 678. The *Udom* court emphasized that "[c]ovenants not to compete that implicate important public policy issues are even more strictly construed." *Id.* at 679.

Here, Columbus has a legitimate business interest in protecting itself from "opportunistic disintermediation" by its customer or by a competing employment agency such as Liberty. Under appropriate circumstances, Columbus could protect this business interest by use of non-compete covenants.

Here, however, as found by the trial court, the hardship to the Therapist Defendants of permitting Columbus to enforce the covenants ranged from "difficult" to "virtually intolerable." This weighs heavily against enforcement of the covenants. Moreover, enforcement of the Therapist Defendants' non-compete covenants would result in loss of continuity of care to the fragile Arlington residents, and loss to the State and the Arlington patients of the value of the highly specialized training given to the Therapist Defendants.

Under all of these circumstances, we are compelled to conclude that the non-compete covenants in the Therapist Defendants' employment agreement with Columbus are not reasonable and not enforceable. In the absence of an enforceable non-compete covenant, we must reverse the trial court's finding that the Therapist Defendants are liable to Columbus for breach of their employment agreements. We must also reverse the trial court's finding that Liberty is liable to Columbus for inducing the Therapist Defendants to breach their employment agreements. This holding pretermits all other issues raised on appeal.

The decision of the trial court is reversed. Costs on appeal are to be taxed to Appellee Columbus Medical Services, LLC, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE